**No. 26-40132**

---

In the United States Court of Appeals
for the Fifth Circuit

---

Vertical Bridge Development, LLC,
*Plaintiff-Appellee*,

*v.*

Town of Westlake, Texas and Town Council
for the Town of Westlake, Texas
*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Eastern District of Texas, Sherman Division

---

# BRIEF FOR THE DEFENDANTS-APPELLANTS

---

ROBERT C. MAY III
ADAM NATHANIEL MENTZER
COLANTUONO, HIGHSMITH & WHATLEY, PC
790 E. Colorado Blvd., Ste. 850
Pasadena, CA 91101
213-542-5700 (office)
213-542-5710 (facsimile)
rmay@chwlaw.us
Counsel for Defendants-Appellants

## CERTIFICATE OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 28.2.1, Appellant certifies that the persons and entities listed below have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **Plaintiff-Appellee:**

   Vertical Bridge Development, LLC – Appellee

2. **Defendants-Appellants:**

   Town of Westlake, Texas – Appellant

   Town Council for the Town of Westlake, Texas – Appellant

3. **Counsel for Plaintiff-Appellee:**

   Bryan Cave Leighton Paisner LLP, Counsel for Appellee

   Ms. Zoe Brannon, Counsel for Appellee

   Mr. Kolton Charles Ellis, Counsel for Appellee

   Mr. William Bebb Francis III, Counsel for Appellee

Mr. Justin D. Hanna, Counsel for Plaintiff in the case below

4. **<u>Counsel for Defendants-Appellants:</u>**

Robert C. May III, Counsel of Record for Defendants-Appellants

Adam N. Mentzer, Counsel of Record Defendants-Appellants

L. Stanton Lowry, Counsel for Defendants in the case below

Matthew Boyle, Counsel for Defendants in the case below

Matthew Butler, Counsel for Defendants in the case below

Alex Crowley, Counsel for Defendants in the case below

**ROBERT C. MAY III**
Counsel for Defendants-Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant respectfully requests oral argument as it believes it could significantly aid the decision process. This case involves a complex subject-matter jurisdiction issue and a question of first impression within this Circuit regarding the appropriate legal test for an alleged effective prohibition under 47 U.S.C. § 332(c)(7)(B)(i)(II), which has been decided differently in other federal courts.

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE ........ 16

I. TOWN REGULATIONS ........ 16

A. Town Code Requirements for Wireless Facilities ........ 17

B. Town Comprehensive Plan ........ 20

II. THE PROPOSED TOWER ........ 21

A. Initial Discussions and Conceptual Plans ........ 21

B. The Lease ........ 24

C. Preapplication Discussions by New Town Council ........ 26

III. APPLICATION REVIEW AND PUBLIC HEARINGS ........ 29

A. PZC Hearings ........ 29

B. First Town Council Hearing ........ 34

C. Final Action and Written Decision ........ 36

IV. THE TWO-SITE SOLUTION ........ 38

V. LITIGATION PROCEEDINGS ........ 41

SUMMARY OF THE ARGUMENT ........ 44

ARGUMENT ........ 47

I. THE ACTION SHOULD BE DISMISSED BECAUSE PLAINTIFF-APPELLEE LACKS STANDING DUE TO UNREDRESSABLE CLAIMS ........ 48

A. The District Court Improperly Assumed Subject Matter Jurisdiction Over State Law Issues Unrelated to an Essential Element in a Federal Claim ........ 49

B. Permitting the District Court's Approach Would Improperly Expand Federal Jurisdiction ........ 51

C. Plaintiff Cannot Establish Redressability ........ 52

D. Alternatively, if the Lease is Properly Before the Court, it Terminated Under the Unambiguous Terms of the Lease ........ 54

II. DISTRICT COURT SHOULD HAVE GRANTED SUMMARY JUDGMENT FOR DEFENDANTS-APPELLANTS ON COUNTS 1 AND 4 IN THE FSC ........ 55

A. The Resolution Satisfies the Written Denial Requirement ..................... 56

1. The Parties' Stipulation to the Resolution as the Final Action and Written Decision is Conclusive Evidence as to that Fact ..................... 57

2. Plaintiff's Attempts to Walk Back the Stipulation are Both Procedurally Defective and Substantively Insufficient ..................... 58

3. Even Without the Stipulation, the Resolution Properly Qualified as the Final Action and Written Decision ..................... 60

B. Substantial Evidence Supports the Denial ..................... 64

C. No Other Genuine Disputes of Material Fact Prevent Summary Judgment in Defendants-Appellants' Favor on Count 1 ..................... 69

III. THE TOWN'S DENIAL DID NOT EFFECTIVELY PROHIBIT WIRELESS SERVICE ..................... 71

A. No Effective Prohibition Exists Because Feasible Alternatives Were Available ..................... 72

B. Feasible, Less Intrusive Alternatives Defeats the Claim ..................... 75

1. The Existence of a Feasible Alternative Defeats the Claim Under Any Test ..................... 77

2. Vertical Bridge Failed to Meaningfully Investigate or Rebut Available Alternatives ..................... 79

C. No Effective Prohibition under Section 253(a) ..................... 82

IV. THE DISTRICT COURT ABUSED ITS DISCRETION IN GRANTING THE PERMANENT INJUNCTION ..................... 83

A. A Procedural Writing Violation Does not Warrant Mandatory Injunctive Relief ..................... 84

B. The District Court Ordered the Wrong Remedy for the Alleged Violation ..................... 86

C. The District Court Independently Abused Its Discretion Under Each Prong of the Standard ..................... 88

D. Traditional Equitable Factors Do Not Support Injunctive Relief ..................... 89

E. The Proper Remedy is Remand ..................... 90

CONCLUSION ..................... 91

# TABLE OF AUTHORITIES

**Pages**

## Federal Cases

*Accelerating Wireless Broadband Deployment*,
33 FCC Rcd. 9088 (Sept. 27, 2018) ........ 74

*Alltel Corp. v. City of Jackson*,
466 F. Supp. 3d 673 (S.D. Miss. 2020) ........ 65, 68, 72

*Am. Tower Corp. v. City of San Diego*,
763 F.3d 1035 (9th Cir. 2014) ........ 78, 81

*Am. Towers LLC v. Town of Shrewsbury*,
No. 17-10642-FDS, 2018 WL 3104105 (D. Mass. June 22, 2018) ........ 85, 86, 88

*AT&T Mobility Servs., LLC v. Vill. of Corrales*,
642 F. App'x 886 (10th Cir. 2016) ........ 73

*AT&T Wireless Servs. of Fla., Inc. v. Orange Cty.*,
982 F. Supp. 856 (M.D. Fla. 1997) ........ 86, 88, 90, 91

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
581 U.S. 170 (2017) ........ 50, 52

*Brehmer v. Planning Bd. of Town of Wellfleet*,
238 F.3d 117 (1st Cir. 2011) ........ 87

*Cellco P'ship v. White Deer Twp. Zoning Hearing Bd.*,
74 F.4th 96 (3d Cir. 2023) ........ 73

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 48

*Clark v. Tarrant Cty., Tex.*,
798 F.2d 736 (5th Cir. 1986) ........ 50

*Crown Castle Fiber, L.L.C. v. City of Pasadena, Tex.*,
76 F.4th 425 (5th Cir. 2023) .................................................. 48, 82, 84

*Elvis Presley Enters., Inc. v. Capece*,
141 F.3d 188 (5th Cir. 1998) .................................................. 58

*ExteNet Sys., Inc. v. Vill. of Plandome*,
No. CV 19-7054, 2021 WL 4449453 (E.D.N.Y. Sept. 29, 2021) .................................................. 85

*F.T.C. v. Nat'l Bus. Consultants, Inc.*,
376 F.3d 317 (5th Cir. 2004). Thus, the Report .................................................. 63

*Helcher v. Dearborn Cnty.*,
595 F.3d 710 (7th Cir. 2010) .................................................. 73

*Horizon Tower Ltd., LLC v. Park Cty.*,
No. 2:23-CV-37-ABJ, 2024 WL 4525229 (D. Wyo. Oct. 4, 2024) .................................................. 74

*King v. Burwell*,
576 U.S. 473 (2015) .................................................. 56

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .................................................. 49, 53

*Martin v. Lee*,
378 Fed. Appx. 393 (5th Cir. 2010) .................................................. 59

*New Cingular Wireless, LLC v. City of Brownsville*,
No. 1:19-cv-91, 2019 WL 8499340 (S.D. Tex. Dec. 20, 2019) .................................................. 66

*New Cingular Wireless PCS LLC v. City of Jennings*,
No. 2:23-CV-01769, 2024 WL 4507832 (W.D. La. Oct. 16, 2024) .................................................. 65

*New Cingular Wireless PCS, LLC v. Kootenai Cty.*,
No. 2:23-CV-00124-AKB, 2025 WL 563911 (D. Idaho Feb. 20, 2025) .................................................. 74

*Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*,
20 F. Supp. 2d 875 (E.D. Pa. 1998) .................................................... 89

*Omnipoint Holdings, Inc. v. City of Cranston*,
586 F.3d 38 (1st Cir. 2009) ............................................... 61, 64, 73, 80

*Reule v. Jackson*,
114 F.4th 360 (5th Cir. 2024) ........................................................ 48, 53

*Second Generation Props., L.P. v. Town of Pelham*,
313 F.3d 620 (1st Cir. 2002) ........................................................ *passim*

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976) ........................................................................... 53

*Smith v. Blackburn*,
785 F.2d 545 (5th Cir. 1986) ......................................................... 59, 60

*Sprint Spectrum L.P. v. Willoth*,
176 F.3d 630 (2d Cir. 1999) ............................................................... 73

*SPRINTCOM, Inc. v. P.R. Regul. & Permits Admin.*,
553 F. Supp. 2d 87 (D.P.R. 2008) .................................................. 85, 87

*Steel Co. v. Citizens for a Better Environment*,
523 U.S. 83 (1998) ....................................................................... 50, 53

*SW Bell Mobile Sys., Inc. v. Todd*,
244 F.3d 51 (1st Cir. 2001) ............................................................... 80

*T-Mobile Cent., LLC v. Charter Tp. of West Bloomfield*,
691 F.3d 794 (6th Cir. 2012) .............................................................. 73

*T-Mobile Ne. LLC v. Loudoun Cnty. Bd. of Sup'rs*,
748 F.3d 185 (4th Cir. 2014) .............................................................. 73

*T-Mobile Northeast LLC v. Fairfax County Bd. of Sup'rs*,
759 F. Supp. 2d 756 (E.D. Va. 2010) ............................................. 79, 80

*T-Mobile S., LLC v. City of Milton, Ga.*,
728 F.3d 1274 (11th Cir. 2013) ............................................... 85, 88, 90

*T-Mobile S., LLC v. City of Roswell*,
574 U.S. 293 (2015) .......... *passim*

*T-Mobile USA, Inc. v. City of Anacortes*,
572 F.3d 987 (9th Cir. 2009) .......... 73, 81

*Tarpon Towers II, LLC v. City Sylvania*,
625 F. Supp. 3d 667 (N.D. Oh. 2022) .......... 62

*Thomas v. Hughes*,
27 F.4th 995 (5th Cir. 2022) .......... 83

*TowerNorth Dev., LLC v. City of Geneva*,
No. 22 C 4151, 2025 WL 975753 (N.D. Ill. Mar. 31, 2025) .......... 74

*Town of Amherst v. Omnipoint Commc'ns Enters., Inc.*,
173 F.3d 9 (1st Cir. 1999) .......... 79

*U.S. Cellular Corp. v. City of Wichita Falls, Tex.*,
364 F.3d 250 (5th Cir. 2004) .......... 47, 64, 65, 70

*Union Pac. R.R. Co. v. City of Palestine*,
41 F.4th 696 (5th Cir. 2022) .......... 48

*United States v. McKinney*,
758 F.2d 1036 (5th Cir. 1985) .......... 58

*United States. v. Texas*,
523 F. Supp. 703 (E.D. Tex. 1981) .......... 59, 60

*USCOC of Greater Iowa, Inc. v. Zoning Bd. of Adjustment of the City of Des Moines*,
465 F.3d 817 (8th Cir. 2006) .......... 73

*Vogue Tower Partners VII, LLC v. City of Elizabethton*,
752 F. Supp. 3d 912 (E.D. Tenn. 2024) .......... 74

*VoiceStream Minneapolis, Inc. v. St. Croix Cty.*,
342 F.3d 818 (7th Cir. 2003) .......... 73

## State Cases

*Uri, Inc. v. Kleberg County*,
543 S.W.3d 755 (Tex. 2018) ..................................................................... 55

## Federal Statutes

28 U.S.C. § 1291.......................................................................................... 15

28 U.S.C. § 1294(a) ..................................................................................... 15

28 U.S.C. § 1332.......................................................................................... 51

28 U.S.C. §§ 1332, 1367(a) ......................................................................... 52

28 U.S.C. § 1332(a) ..................................................................................... 51

47 U.S.C. § 253(a) ............................................................................ 42, 82, 83

47 U.S.C. § 332(c)(7)(B)(i)(II) .......................................................... 42, 72

47 U.S.C. §§ 332(c)(7)(B)(ii), (v) ............................................................ 63

47 U.S.C. § 332(c)(7)(B)(iii) .............................................................. 42, 56

47 U.S.C. § 332(c)(7)(B)(v) ............................................................ 55, 64, 85

## State Statutes

WESTLAKE, TEX., CODE, Chapter 102 ................................................ 17, 37

WESTLAKE, TEX., CODE, Chapter 102-91 .................................................. 19

WESTLAKE, TEX., CODE § 102-63(e)(2)(a) ............................................... 66

WESTLAKE, TEX., CODE § 102-94(3)(b), (d) ............................................. 66

WESTLAKE, TEX., CODE § 102-94(6) .............................................. *passim*

Foreign Sovereign Immunities Act ............................................................ 52

TEX. LOCAL. GOV'T CODE § 551.071 ........................................................ 37

Telecommunications Act ........ 50

WESTLAKE, TEX., CODE § 102-63(e)(2)(d) ........ 18, 19, 66

WESTLAKE, TEX., CODE § 102-94(2) ........ 18

WESTLAKE, TEX., CODE § 102-94(4) ........ 21

WESTLAKE, TEX., CODE § 102-94(5)(v) ........ 56

TEX. LOC. GOV'T CODE § 211.004 ........ 71

TEX. LOC. GOV'T CODE §§ 211.009, ........ 55

TEX. LOC. GOV'T CODE §§ 211.011 ........ 55

**Rules**

FED. R. CIV. P. 10(c) ........ 70

FED. R. CIV. P. 16(e) ........ 59

FED. R. CIV. P. 56(a) ........ 47

FED. R. CIV. P. 56(c) ........ 48

FED. R. CIV. P 26(f) ........ 60

**Regulations**

47 C.F.R. § 1.6003(c)(iv) ........ 63

**Other Authorities**

PZC Meeting Video at 00:42:00–00:46:28 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 ........ 31, 68

PZC Meeting Video at 00:45:15–00:46:15 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 ........ 32

PZC Meeting Video at 00:45:36–00:46:28 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 ........ 32

PZC Meeting Video at 00:46:55–00:47:20 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 .... 32

PZC Meeting Video at 00:47:20–00:47:52 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 .... 32

PZC Meeting Video at 00:48:05–00:48:30 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 .... 33

PZC Meeting Video at 00:48:30–00:48:37 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 .... 33, 68

PZC Meeting Video at 00:48:54–00:50:05 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 .... 33

PZC Meeting Video at 00:52:40–00:53:10 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 .... 33

PZC Meeting Video at 00:53:10–00:53:50 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 .... 33, 68

PZC Meeting Video at 00:54:00–00:54:30 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 .... 34, 67

Town Council Meeting Video at 01:53:05–01:54:32 (July 15, 2024), https://westlaketx.new.swagit.com/videos/310180 .... 35

Town Council Meeting Video at 01:55:30–01:55:42 (July 15, 2024), https://westlaketx.new.swagit.com/videos/310180 .... 36, 41

Town of Westlake, Tex., Comprehensive Plan Update (Mar. 2, 2015), https://www.westlake-tx.org/140/Comprehensive-Plan .... *passim*

Town of Westlake, Tex., Comprehensive Plan Update (Mar. 2, 2015), https://www.westlake-tx.org/140/Comprehensive-Plan; .... 17

]

## JURISDICTIONAL STATEMENT

The District Court's subject matter jurisdiction is disputed. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Venue is proper pursuant to 28 U.S.C. § 1294(a). Appellant timely appealed by filing a notice of appeal within 30 days from the District Court's final decision by the order dated March 6, 2026.[1]

[1] ROA 5013–5014; ROA 5081–5082.

# ISSUES PRESENTED

1. Did the District Court err when it exercised subject matter jurisdiction over state-law contract questions that did not overlap with any federal questions raised in the complaint?
2. Did the District Court err when it found that Vertical Bridge had standing and, as a result, failed to dismiss Vertical Bridge's claims for lack of subject matter jurisdiction?
3. Did the District Court commit reversable error when it found that the Resolution did not constitute the Town Council's final action and written decision even though the Town Code requires a written report as its final action and the parties stipulated to the Resolution as the Town Council's final action and written decision in their Joint Pre-Trial Report?
4. Did the District Court commit reversable error when it failed to consider the evidence in the written record as detailed in the Resolution that supported the Town Council's denial?
5. Did the District Court abuse its discretion when it granted a permanent injunction against Defendants-Appellants?

## STATEMENT OF THE CASE

This case involves a proposed personal wireless communication facility (the "Proposed Tower") by Vertical Bridge Development, LLC ("Vertical Bridge") on Town-owned property located at 2000 Dove Road, Westlake, Texas (the "Fire Station").[2]

### I. TOWN REGULATIONS

Chapter 102 in the Code of Ordinances of the Town of Westlake, Texas (the "Town Code"), sets out the local standards, procedures and other regulations that govern development projects, which includes wireless facilities.[3] The Town of Westlake, Texas, Comprehensive Plan ("Comprehensive Plan") sets out the goals and policies that guide Chapter 102's regulations and implementation.[4] Taken together, these

---

[2] ROA 3955–3956.

[3] WESTLAKE, TEX., CODE, Chapter 102, https://library.municode.com/tx/westlake/codes/code_of_ordinances?nodeId=COOR_CH102ZO.

[4] Town of Westlake, Tex., Comprehensive Plan Update (Mar. 2, 2015), https://www.westlake-tx.org/140/Comprehensive-Plan; *see also* Westlake, Tex., Ord. No. 747, § 3 (Mar. 2, 2015) (approving all "land use assumptions in [the] Comprehensive Plan").

requirements chart a roadmap for how and whether the Town may approve or deny wireless facilities.

### A. Town Code Requirements for Wireless Facilities

A specific use permit ("SUP") is required for any wireless tower in a nonresidential zone that violates any applicable development standards (other than screening). WESTLAKE, TEX., CODE § 102-94(2). An SUP provides a potential path to approval if conditions on the locational, functional or operational factors can mitigate the adverse impacts from the development project and allow the Town Council of the Town of Westlake ("Town Council") to make all the findings required in the Code. *Id.* §§ 102-63(b), 102-63(e)(2)(a)–(d).

The SUP process requires at least two public hearings: one to seek a recommendation from the Planning and Zoning Commission ("PZC") and another before the Town Council. *Id.* §§ 102-63(b), 102-63(e)(2). Both the PZC and Town Council must consider whether the generally applicable findings for an SUP can be made, which are:

> a. [c]omplement or be compatible with the surrounding uses and community facilities;

> b. [c]ontribute to, enhance or promote the welfare of the area of the [specific use] and adjacent properties;
>
> c. [n]ot be detrimental to the public health, safety or general welfare; and
>
> d. [c]onform in all other respects to all applicable zoning regulations and standards.

*Id.* § 102-63(e)(2).

The last finding requires decisionmakers to consider the regulations applicable to the location and proposed use. WESTLAKE, TEX., CODE § 102-63(e)(2)(d). Regulations applicable to the location, zoned "Government Use" or "GU" in this case, are set out in Code § 102-124, Figure 2 (Westlake District Development Chart). Most relevant to this case, structures in GU districts generally cannot exceed 50 feet and must maintain a 50-foot setback from the rear property line. *Id.*

Regulations applicable to wireless facilities are set out in Code Chapter 102-91. These standards generally seek to avoid adverse aesthetic impacts. *Id.* §§ 102-96(1)–(5). For example, the PZC cannot recommend approval unless:

> c. The [PZC] determines that adequate information has been provided to enable the commission to review the application in a

> knowledgeable and thorough manner. Therefore, the applicant shall provide the following information or shall note why this information is not available:
>
> 1. Why location on an existing structure or wireless communications facility is technically not feasible;
>
> 2. Permission for collocation of other wireless communication facilities and antennas at the site;
>
> 3. Identification of the applicant's backhaul provider connecting antenna sites;
>
> 4. Description of how applicant has met the conditions and requirements as presented in this division except as specified on the SUP; and
>
> 5. Documentation that conclusively demonstrates that such request is necessary and critical to the communications operation of the provider.

*Id.* § 102-94(4)(c). In addition, the Town Council must consider:

> a. [t]he need to provide wireless service to the populace;
>
> b. [e]ffect on the value of the surrounding property;
>
> c. [p]otential for interference with the use of surrounding properties;
>
> d. [a]esthetics;

> e. [c]ompatibility with nearby properties;
>
> f. [the p]rovisions of 47 CFR 25.104, which preempt local zoning or other regulations that differentiate between satellite receive-only antennas and other types of wireless communication facilities . . . ; [and]
>
> g. [u]nique conditions that govern reception on a lot.

*Id.* §§ 102-94(3)(a)–(g).[5] If the Town Council denies an SUP for a wireless facility, it must issue a written report with substantial evidence to support the denial. *Id.* § 102-94(6).

### B. Town Comprehensive Plan

The Comprehensive Plan articulates land use "[i]ntent and desires, and . . . protect[s] the health, safety and welfare of the present and future residents of Westlake."[6] These goals and polices promote the Town's quality and "[r]ural residential character which will maintain and enhance the natural features of the Town."[7]

---

[5] The PZC must also consider whether the application satisfies certain conditions. WESTLAKE, TEX., CODE § 102-94(4).

[6] Town of Westlake, Tex., Comprehensive Plan Update (Mar. 2, 2015), https://www.westlake-tx.org/140/Comprehensive-Plan.

[7] *Id.*

View preservation is central to the Comprehensive Plan.[8] This goal should be accomplished by "[m]aintaining views of a largely undeveloped foreground as Westlake grows . . . [and] view sheds that contain essential elements of Westlake's pastoral character."[9] Development in certain viewsheds below Dove Road that look east toward Highway 114 is particularly sensitive because no high elevation landforms exist to screen the view from the residential areas to the west.[10] View preservation promotes and sustains the Town's pastoral character and property values.[11]

## II. The Proposed Tower

### A. Initial Discussions and Conceptual Plans

On December 10, 2018, the Town Council first discussed the Proposed Tower.[12] The conceptual proposal by Vertical Bridge involved an 80-foot tower that would "provid[e] space for a restricted number of

---

[8] *See, e.g.*, ROA 4128 (quoting Comprehensive Plan at pp.111–119, pp.122–123, pp.183–184).

[9] ROA 4128 (quoting Comprehensive Plan at pp.111–119).

[10] ROA 4129 (quoting Comprehensive Plan at p.129).

[11] ROA 4128 (quoting Comprehensive Plan at p.74).

[12] ROA 4249–4250.

cell providers" and which staff concluded would likely require an SUP.[13] Even at this first introduction, the Town Council inquired about alternative locations and/or alternative designs to reduce the overall height.[14]

On June 22, 2020, the Town Council adopted Resolution No. 20-21,[15] which "authorize[d] the Town Manager to engage stakeholders and cellular providers in formal discussions related to the Proposed Tower's design, construction and ownership of a potential cell tower."[16] Resolution No. 20-21 did not authorize any Town staff member to bind the Town Council, who retained final approval authority.[17]

Although initially scheduled as a consent item (which requires no presentation by staff or the applicant and no formal discussion by the Town Council), the Town Council received a report from Mr. Jarrod Greenwood, then the Assistant Town Manager, who explained that

---

[13] *See* ROA 4250, 4254–4255.

[14] ROA 4260.

[15] ROA 4273–4274, 4281–4282; ROA 4273–4274.

[16] ROA 4281.

[17] ROA 4273.

Vertical Bridge's conceptual plan for the Proposed Tower now involved a 120-foot tower to accommodate a third carrier and generate additional revenues.[18]

Discussion among the Town Councilmembers focused on the visual impact created by the additional 40 feet added to the Proposed Tower. Then-Mayor Wheat expressed aesthetic concern about the Proposed Tower's "offensive" appearance.[19] Councilmember Trivedi noted that, unlike the Proposed Tower, wireless facilities integrated into buildings are typically not visible and inquired about alternative locations and designs.[20] Mr. Greenwood responded that the alternative sites analysis showed a facility directly across from the Vaquero Club near Davis Boulevard would be viable.[21] Councilmember Trivedi directed staff to research other locations.[22]

[18] ROA 4273.

[19] ROA 4274.

[20] ROA 4273–4274.

[21] ROA 4274.

[22] ROA 4274.

### B. The Lease

On January 24, 2022, the Town Council adopted Resolution No. 22-05,[23] which authorized the Town Manager to execute a lease agreement with Vertical Bridge as shown in an attached form (the "Council-Approved Lease").[24] At this time, the Town Council heard the Proposed Tower would still likely require an SUP but could accommodate three carriers at 100 feet in overall height.[25] An exhibit to the Council-Approved Lease also depicted the Proposed Tower as 100 feet tall.[26]

Both the Council-Approved Lease and the later-executed lease agreement (the "Lease") contained a provision that states:

> [n]otwithstanding anything to the contrary in this [Lease], to the extent that [Vertical Bridge]'s zoning application for the installation of the Communication Facilities within the Premises on the Property is denied and such zoning denial becomes final and unappealable, then this [Lease] shall terminate automatically effective as of the

---

[23] ROA 4322–4347.

[24] ROA 4314, 4284.

[25] *See* ROA 4317, 4354.

[26] *See* ROA 4341.

> date that such zoning denial becomes final and unappealable.[27]

The staff report associated with Resolution No. 22-05 reflected the understanding that the lease would automatically terminate if the Town Council denies the "zoning application" for the Proposed Tower.[28]

On or around July 27, 2022, Mr. Troy Meyer, then the Assistant City Manager, approved amendments to the Council-Approved Lease.[29] One amendment replaced the exhibit that depicted the overall height with one that showed a taller Proposed Tower.[30] However, no records exist to show whether the Town Council ever approved—or even knew about—such an amendment that conflicted with the Council-Approved Lease attached to Resolution No. 22-05. Nevertheless, on November 14, 2022, the Lease became fully executed.[31]

---

[27] ROA 4325.

[28] ROA 4318 (stating that "[t]he proposed Vertical Bridge Agreement includes a termination provision in the event zoning is not approved by the Town").

[29] *See* ROA 4390.

[30] *See* ROA 4390.

[31] *See* ROA 4337–4338.

### C. Preapplication Discussions by New Town Council

Between January 24, 2022, and December 19, 2022, Town residents voted to replace the mayor and all but one councilmember. The net effect resulted in an entirely different Town Council.

Significant turnover among staff followed shortly thereafter. Staff departures included at least two Town Secretaries, two senior deputies in the Town Manager's Office (Mr. Greenwood and Mr. Meyer) and the Development Director, Mr. Ron Ruthven. Even the Town's original wireless consultant passed away from a heart attack in May 2022.[32] By the time the Application reached the Town Council for a decision, almost no one from the Town involved from the Proposed Tower's inception remained on staff. Moreover, the Town Planner, responsible for reports for the PZC and Town Council related to the Application, was staffed by a temporary independent contractor.[33]

On December 19, 2022, the newly-elected Town Council received a staff report on the Proposed Tower, the Lease and how both came to

[32] ROA 4132 n.28 (citing Town Council Meeting Video at 00:10:50:–00:10:55: (Dec. 19, 2020), https://westlaketx.new.swagit.com/videos/191492 (Troy Meyer)).

[33] ROA 1654, 4132, 4630–4631.

be.[34] Mr. Meyer presented the Town Council with more-or-less the same presentations from the prior Town Council meetings.[35] Councilmember David Quint voiced aesthetic concerns because "[the Proposed Tower] is going to be highly visible."[36] Councilmember Anna White inquired into other locations further west.[37]

On September 25, 2023, the Town Council held a discussion about the Proposed Tower.[38] Staff raised concerns that the Proposed Tower (at this point back to 120 feet) might not be the "correct or complete solution [that] solves cellular coverage issues in Westlake" and recommended further evaluation of alternative approaches before proceeding.[39]

Staff also directly approached "Verizon and AT&T to voice this concern" and requested both consider alternative designs that included

---

[34] *See* ROA 4392.

[35] ROA 4514–4539.

[36] ROA 4132 n.28 (citing Town Council Meeting Video at 00:09:20–00:09:35 (Dec. 19, 2020) (statement by Councilmember Quint)).

[37] ROA 4132 n.28 (citing Town Council Meeting Video at 00:10:00–00:10:16 (Dec. 19, 2020) (statement by Councilmember White)).

[38] *See* ROA 4404.

[39] *See* ROA 4408–4409.

"smaller cell towers" which "could include a public private partnership to ensure Westlake has good cellular signal throughout Town."[40] Finally, staff recommended that the Town Council refrain from further action on the Proposed Tower until less intrusive alternatives could be investigated.[41]

On March 4, 2024, the Town Council held a follow-up discussion about the Proposed Tower.[42] Staff reiterated its concerns about the Proposed Tower and the need to investigate less-intrusive alternatives.[43] Staff also reported back that preliminary discussions with carriers indicated that alternatives with multiple facilities appeared feasible but potentially expensive.[44]

---

[40] ROA 4409.

[41] ROA 4409.

[42] *See* ROA 4411.

[43] *See* ROA 4411–4412.

[44] ROA 4409, 4412.

## III. Application Review and Public Hearings

On April 23, 2024, Vertical Bridge applied for an SUP to authorize the Proposed Tower (the "Application").[45] Vertical Bridge again increased the overall height, this time to 134 feet.[46]

### A. PZC Hearings

On May 7, 2024, the PZC received an informational staff report with updates about the Proposed Tower and conducted a discussion among the commissioners.[47] Staff noted that the Proposed Tower would need a waiver from both setback and overall height requirements. Chair Adam Coffey characterized the Proposed Tower as "anything but stealth".[48] Commissioner Tammy Reeves raised the concern that the Proposed Tower detracts from the view preservation goals identified in the Comprehensive Plan.[49] The PZC also identified at least five other

---

[45] ROA 4100–4101.

[46] ROA 4101.

[47] *See* ROA 4415.

[48] ROA 4150 n.60 (citing PZC Meeting Video at 00:12:10–00:12:48 (May 7, 2024), https://westlaketx.new.swagit.com/videos/304510 (statement by PZC Chair Coffey)).

[49] ROA 4133–4144. These comments were previously misattributed to PZC Commissioner Lanny Huggins, rather than PZC Commissioner Tammy Reeves. *See, e.g.*, ROA 4144 (citing PZC Meeting Video at

alternatives that would be less intrusive compared to the Proposed Tower.[50]

On July 9, 2024, the PZC conducted a duly-noticed public hearing to consider whether to recommend approval or denial to the Town Council.[51] The PZC received presentations from staff and Vertical Bridge, heard public testimony and, after deliberation, conducted a voice vote to recommend the Town Council deny the Application.[52]

The PZC received testimony from residents Ted Christiansen, Anna Eisen and Susan Matthews, who all raised concerns about how adverse aesthetic impacts from the highly visible structure would reduce property values for residential homes on nearby Gaillardia Court.[53] Mr. Christiansen noted that:

- He lives "150 feet behind the tower in a $4 million house that's going to take a serious hit in value" and described the design and finish materials as "lipstick on a pig" because, at

---

00:17:42–00:18:17 (May 7, 2024), https://westlaketx.new.swagit.com/videos/304510 (statement by PZC Commissioner Reeves)).

[50] ROA 3969–3971.

[51] *See* ROA 4541–4542.

[52] *See* ROA 4542.

[53] ROA 4541.

the proposed height, "when I go out onto my patio, that's all we would see".[54]

- He and other residents chose to invest in their respective properties because the views to the east would remain open space.[55] Ms. Eisen, a neighbor to Mr. Christiansen, provided similar testimony.[56]

- The Proposed Tower need "waivers for just about everything . . . we wanted to avoid" but neither he nor his neighbors have any wireless reception problems.[57]

Ms. Anna Eisen noted that the Proposed Tower would be:

> about the same as five high school football goalposts stacked one above another. . . . the same height as the Cape Canaveral lighthouse . . . [and] . . . about the same height as the Statue of Liberty without its pedestal . . . and . . . it is approximately

[54] ROA 4134 n.42 (citing public testimony from Mr. Christiansen, Ms. Eisen and Ms. Matthews); PZC Meeting Video at 00:42:00–00:46:28 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Ted Christiansen).

[55] ROA 4134 n.42; *see also* PZC Meeting Video at 00:45:15–00:46:15 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Ted Christiansen).

[56] ROA 4134 n.42; *see also* PZC Meeting Video at 00:46:55–00:47:20 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Anna Eisen).

[57] ROA 4134 n.42; *see also* PZC Meeting Video at 00:45:36–00:46:28 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Ted Christiansen).

> the same height as the SpaceX Starship without the booster.[58]

She also testified that her residence is the closest to the Proposed Tower and the Association of Realtors expects an average 9.78% decrease in value when the tower is visible from the property.[59] She estimates that the Proposed Tower would cause a $2 million decrease property values on Gaillardia Court.[60] Finally, Ms. Eisen raised concerns about lightning strikes drawn to the Proposed Tower that damage nearby dwellings as the electricity spreads through the ground.[61]

Lastly, Ms. Matthews, a resident and licensed realtor who specializes in Westlake properties, expressed her "serious concerns about how this [Proposed Tower] is going to affect the real estate in

---

[58] ROA 4134 n.42; *see also* PZC Meeting Video at 00:47:20–00:47:52 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Anna Eisen).

[59] ROA 4134 n.42; *see also* PZC Meeting Video at 00:48:05–00:48:30 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Anna Eisen).

[60] ROA 4134 n.42; *see also* PZC Meeting Video at 00:48:30–00:48:37 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Anna Eisen).

[61] ROA 4134 n.42; *see also* PZC Meeting Video at 00:48:54–00:50:05 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Anna Eisen).

Westlake."[62] She noted that buyers are often concerned about aesthetics and characterized the Proposed Tower as "obnoxious".[63] Ms. Matthews reported that a wireless tower nearby can reduce a home value between 2% and 20% depending on proximity and visibility and also adversely impact marketability.[64]

Grounds for the PZC's recommendation included: (1) the Proposed Tower conflicted with the Code because it exceeded the applicable height limit, rear setback limit and residential setback requirements; (2) the Proposed Tower conflicted with the Comprehensive Plan because it contravened view preservation goals; (3) given the conflicts with the Code and Comprehensive Plan, the Proposed Tower conflicted with community aesthetics and was incompatible with nearby residential uses; and (3) Vertical Bridge failed to investigate less intrusive

---

[62] ROA 4134 n.42; *see also* PZC Meeting Video at 00:52:40–00:53:10 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Susan Matthews).

[63] ROA 4134 n.42; *see also* PZC Meeting Video at 00:53:10–00:53:50 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Susan Matthews).

[64] ROA 4134 n.42; *see also* PZC Meeting Video at 00:54:00–00:54:30 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Susan Matthews).

alternatives identified at public meetings and hearings conducted by the Town.[65]

### B. First Town Council Hearing

On July 15, 2024, the Town Council conducted a duly-noticed public hearing to consider whether to approve or deny the Application.[66] The Town Council received a report from staff, which included the PZC's recommendation to deny the Application, a presentation from Vertical Bridge and testimony from the public. After deliberation, the Town Council conducted a voice vote to unanimously deny the Application.[67]

Ms. Eisen again spoke against the Proposed Tower, supporting the PZC's recommended denial, restating key points from prior public testimony by her, Mr. Christiansen and Ms. Matthews about the adverse aesthetic impacts and diminished property values the Proposed

---

[65] *See* ROA 3883–3884, 4428, 3957.

[66] ROA 4428.

[67] ROA 4421.

Tower would cause.[68] She also noted that the Proposed Tower would not compliment the Fire Station, on which the Town spend considerable time and effort.[69]

In addition to the reasons and evidence identified by the PZC, the Town Council could not make the findings required to approve an SUP for the Proposed Tower.[70] Although the Town Council voted to deny the Application, the temporary independent contractor who prepared the staff report for the July 15th Town Council Meeting did not include a written report with the findings for denial at that time.[71] On August 5, 2024, the Town Council approved minutes from the July 15th Town Council Meeting (the "Minutes") that reflected the voice vote to deny the Application occurred, but did not include the reasons for the denial.[72]

---

[68] ROA 4421; *see also* Town Council Meeting Video at 01:53:05–01:54:32 (July 15, 2024), https://westlaketx.new.swagit.com/videos/310180 (statement by Anna Eisen).

[69] Town Council Meeting Video at 01:55:30–01:55:42 (July 15, 2024), https://westlaketx.new.swagit.com/videos/310180 (statement by Anna Eisen).

[70] ROA 4421, 4667–4687.

[71] ROA 4666.

[72] ROA 4421.

### C. Final Action and Written Decision

On March 24, 2025, the Town Council held a duly noticed public meeting to consider Resolution No. 25-12 (the "Resolution") with written reasons for the denial as required by Code § 102-94(6) for a final action on the Application.[73] Consistent with Texas State law, TEX. LOCAL. GOV'T CODE § 551.071, the Town Council announced and conducted an executive session meeting with legal counsel before the hearing on the Proposed Tower.[74] Afterwards, the Town Council unanimously approved the Resolution.[75]

The Resolution sets out the grounds for the denial and supporting evidence. The document addresses each required finding for SUP approval, each required consideration under Code chapter 102, the general development standards applicable to the Proposed Tower and the salient guidance from the Comprehensive Plan. As more fully explained in the Resolution, the Town Council could not make any findings needed for SUP approval because the Proposed Tower: (1)

---

[73] *See* ROA 4428.

[74] *See* ROA 4428.

[75] ROA 4688.

violated at least two objective development standards; (2) interfered with the view preservation policies in the Comprehensive Plan; and (3) would not provide a benefit to the community that meets or exceeds the countervailing adverse aesthetic impacts.[76]

In the Resolution, the Town found that Vertical Bridge had not demonstrated that the proposed tower was necessary at the requested location or that it represented the least intrusive means of addressing wireless service needs, as Vertical Bridge failed to show that identified alternative sites and configurations were infeasible or unavailable and presented no evidence of meaningful efforts to investigate those alternatives.[77] This was despite the Town repeatedly requesting that Vertical Bridge investigate those alternatives.[78]

The denial had practical consequences for the project. Under the lease agreement between the Town and Vertical Bridge, the agreement terminates automatically if zoning approval is denied and becomes

---

[76] ROA 4667–4687.

[77] ROA 3957–3959, 3969–3970.

[78] ROA 3883, 4409.

final.[79] The denial therefore foreclosed construction of the proposed tower at the leased site.

## IV. THE TWO-SITE SOLUTION

Unpersuaded by Vertical Bridge's non-response to the Town's repeated requests to investigate multi-site solutions,[80] the Town engaged Mr. Lee Afflerbach, a professional engineer with decades-long experience in communication networks and wireless facilities, for an independent evaluation.[81] On April 18, 2025, Mr. Afflerbach submitted an expert report that concluded Vertical Bridge's customers could achieve the same or better coverage from two 80-foot towers, with one placed at the Fire Station and the other in Town-owned right-of-way near Davis Boulevard and Lakeshore Drive (the "Two-Site Solution").[82]

Mr. Afflerbach's comparative analysis used Vertical Bridge's and its customers' own computer-modeled coverage predictions to and predictions based on industry-standard software tools to model the Two-

---

[79] ROA 3644.

[80] *See, e.g.*, ROA 4409.

[81] ROA 2483–2485.

[82] ROA 1900–1906, 1942–1951.

Site Solution.[83] He visually depicted the results as a comparison between a signal propagation maps submitted by Vertical Bridge to show intended coverage by the Proposed Tower against a signal propagation map to show predicted coverage from the Two-Site Solution.[84]

Mr. Afflerbach also concluded that the Two-Site Solution would be the most efficient multi-site solution because it could replicate the desired service improvement with the same equipment carriers would use on the Proposed Tower.[85] In his opinion, the Two-Site Solution may be the most efficient option because it would provide coverage in areas not reachable from the Proposed Tower.[86] On or around April 4, 2025, Vertical Bridge's expert, Mr. Richard Conroy, submitted an expert report (the "Conroy Report").[87] The Conroy Report included a "drive test" to empirically measure signal levels without the Proposed Tower

---

[83] ROA 1897, 1935.

[84] ROA 1903–1904.

[85] ROA 1897, 1933–1934.

[86] ROA 1934.

[87] ROA 2596–2621.

and with temporary antennas to simulate signal levels with the Proposed Tower.[88] The drive test involved "antenna centerline test heights of 80', 100', and 110' . . . at the approximate proposed site location and ground elevation."[89] Although the Conroy Report attempted to disqualify alternatives listed in the Resolution, it did not address the Two-Site Solution.

The Conroy Rebuttal Report addressed the Two-Site Solution.[90] Among the "feasibility" criticisms, Mr. Conroy stated that: (1) a proper analysis considers "whether the site meets the *propagation* and link budget goals"; (2) his drive-test results show that an 80-foot maximum height at the Fire Station would "not provide sufficient coverage and therefore *require additional sites*"; and (3) Mr. Afflerbach did "not identify where exactly the second site is to go".[91] The Conroy Rebuttal Report stated that "[t]he documents reviewed and considered in making this rebuttal report include: my initial report, the Afflerback Report, the

88 ROA 2598–2599.

89 ROA 2598–2599.

90 ROA 2623–2627.

91 ROA 2624–2625 (emphasis added).

transcript of the deposition of Mr. Afflerbach, the exhibits thereto, and the Town code."[92] At Mr. Conroy's deposition he testified that he prepared propagation maps to evaluate the two-site solution contained within the Afflerbach Report, but did not include those maps in the rebuttal report.[93] Additionally, he testified that his drive test did not include replicated signals from the second site at Davis Boulevard and Lakeshore Drive, and he could ascertain the second-site location from description and depiction in the Afflerbach Report.[94] Mr. Conroy also indicated that the Two-Site Solution would be possible to achieve but less cost efficient than the Proposed Tower.[95]

## V. Litigation Proceedings

On September 3, 2024, Plaintiff filed a complaint against Defendants ("Complaint"), that alleged the denial: (1) lacked substantial evidence under 47 U.S.C. § 332(c)(7)(B)(iii); (2) effectively prohibited personal wireless services under 47 U.S.C. §

---

[92] ROA 2624.

[93] ROA 2886-2887, 2890–2891.

[94] ROA 2887–2888.

[95] ROA 2881.

332(c)(7)(B)(i)(II); and (3) effectively prohibited telecommunication services under 47 U.S.C. § 253(a).[96] On April 15, 2025, Vertical Bridge filed its First Supplemental Complaint ("FSC"), which added "alternative" claims to reflect the final action taken in the Resolution.[97]

The parties filed cross motions for summary judgment.[98] On November 17, 2025, the parties filed a Joint Pre-Trial Final Order,[99] which included a joint stipulation that:

> On March 24, 2025, the Town Council adopted Resolution No. 25-12 as its written denial and final action on the application.

ROA 4703 (the "Stipulation"). Plaintiff's counsel originally proposed the Stipulation, and it remained in all drafts exchanged between the parties.[100]

On December 9, 2025, the Honorable Bill Davis issued a Report and Recommendation (the "Magistrate's Report") that concluded: (1)

---

[96] ROA 20–35.

[97] ROA 1062–1082.

[98] ROA 2939–2987 ("Plaintiff's MSJ"); ROA 1416–4159 ("Defendants' MSJ").

[99] ROA 4690–4708.

[100] ROA 4943–4944.

subject matter jurisdiction existed even though the District Court's power to grant an effective remedy depended on the state-law issue regarding whether Vertical Bridge held a valid lease; and (2) should grant Plaintiff's MSJ and deny Defendants' MSJ because the Magistrate's Report found the Minutes—rather than the Resolution as per the Stipulation—constituted the Town's final action and written decision, and the Minutes lacked written reasons for the Town Council's decision to deny the Proposed Tower.[101] The Magistrate's Report did not address the effective prohibition claims raised by Vertical Bridge and disputed by the Defendants.

On December 23, 2025, the Defendants timely filed Objections to the Report. ROA 4934–4942 (the "Objections"). Defendants sought leave to reply to Plaintiff's response to the Objections,[102] but the District Court neither granted nor denied that motion.

On February 4, 2026, the District Court issued a memorandum adopting the Magistrate's Report ("Order") and its Final Judgment.[103]

[101] ROA 4910–4929.

[102] ROA 4975–4979.

[103] ROA 5013–5015.

Neither the Order nor the Final Judgment addressed the Objections. On March 6, 2026, Defendants timely filed a notice of appeal from the Order and Final Judgment.[104]

## SUMMARY OF THE ARGUMENT

This appeal is about local authority to balance the legitimate interest in deploying advanced personal wireless services against the equally important interests of preserving community character and property values.

***First***, the District Court erred when it exercised jurisdiction over the state-law issues related to the Lease. Although true that sometimes the merits and jurisdiction come intertwined when a state-law issue overlaps with an essential element in a federal question that confers subject matter jurisdiction, no such overlap exists here. No element in any federal claim raised in the Complaint depends on whether Plaintiff-Appellee holds an interest in the Property sufficient to build and operate the Proposed Tower. Accordingly, municipal lease disputes belong in state court.

---

[104] ROA 5081–5082.

Moreover, without the Lease, Plaintiff-Appellee lacks standing because its alleged harm cannot be redressed without both a permit for the Proposed Tower and a property right to construct the facility authorized by the permit. The Magistrate's Report recognized the limit on federal judicial power to compel the Town to reinstate the Lease or grant a new one. Accordingly, but for this legal error, the entire Complaint should have been dismissed.

***Second***, the District Court's finding that the Minutes served as the final action and written decision is clearly erroneous because it fails to acknowledge the parties' Stipulation that the Resolution served as the final action and written decision. Although raised in the Objections, the District Court never explained why it disregarded the Stipulation's conclusive evidentiary effect that supersedes all prior pleadings. Likewise, the District Court never explained whether it granted Plaintiff-Appellee's procedurally defective and substantively insufficient attempts to walk back its assent in its Reply to Objections. Thus, this Court should find that the District Court clearly erred when it found the Minutes to be the final action and written decision.

***Third***, the first two errors lead the District Court to grant summary judgment for the Plaintiff-Appellee without a substantive inquiry into the underlying claims. Even if Plaintiff-Appellee could prove standing, the overwhelming evidence in the record supports the Town's denial and admissions by Plaintiff-Appellee's own expert witness that less-intrusive and still technically feasible alternatives were rejected because they would be too labor intensive or expensive moots all remaining claims that the Town effectively prohibited any entity's ability to provide personal wireless or telecommunication services.

***Finally***, the legal error and clearly erroneous factual finding lead the District Court to err in its Order and Final Judgment. The entire case should have been dismissed because Plaintiff-Appellee lacks standing. Even if Plaintiff-Appellee could somehow show standing, the clearly erroneous failure to afford the Stipulation its conclusive effect precluded the District Court's conclusion that the Town's denial lacked substantial evidence.

Defendants-Appellants respectfully request that this Court reverse the Order and Final Judgment based on these legal errors and

clearly erroneous factual findings, and remand with instructions to grant summary judgment for Defendants-Appellants.

## ARGUMENT

This court "review[s] *de novo* a district court's ruling on a motion for summary judgment and use[s] the same legal standard that the district court used." *U.S. Cellular Corp. v. City of Wichita Falls, Tex.*, 364 F.3d 250, 255 (5th Cir. 2004); FED. R. CIV. P. 56(a). A summary judgment motion is properly granted only when, viewing the evidence in the light most favorable to the nonmoving party, the record indicates that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "On cross-motions for summary judgment," the Fifth Circuit reviews "each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Union Pac. R.R. Co. v. City of Palestine*, 41 F.4th 696, 703 (5th Cir. 2022) (quoting *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010)).

Summary judgment based on federal preemption presents a question of law that the Fifth Circuit also reviews *de novo*. *Union Pac. R.R. Co. v. City of Palestine*, 41 F.4th 696, 703 (5th Cir. 2022).

The *de novo* standard also applies to Article III standing issues. *Crown Castle Fiber, L.L.C. v. City of Pasadena, Tex.*, 76 F.4th 425, 432 (5th Cir. 2023). "The issue of subject matter jurisdiction cannot be waived, and federal courts are duty-bound to examine the basis of subject matter jurisdiction at all stages in the proceedings and dismiss if jurisdiction is lacking." *Reule v. Jackson*, 114 F.4th 360, 365 (5th Cir. 2024) (internal quotations and citations omitted).

## I. THE ACTION SHOULD BE DISMISSED BECAUSE PLAINTIFF-APPELLEE LACKS STANDING DUE TO UNREDRESSABLE CLAIMS

Plaintiff bears the burden to establish standing, which includes the burden to establish that the relief it seeks will likely redress its asserted injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). It cannot meet that burden here. Plaintiff's theory of standing depends on a state-law lease dispute that is either not properly before the Court or, if it is, resolves against Plaintiff. In either scenario, there is no redressable injury.

### A. The District Court Improperly Assumed Subject Matter Jurisdiction Over State Law Issues Unrelated to an Essential Element in a Federal Claim

The District Court's standing analysis rests entirely on its resolution of a state-law lease dispute.[105] But the court improperly resolved a disputed state-law issue that is independent of the federal claim in order to manufacture redressability.

Federal courts may resolve non-federal issues in only limited circumstances: when federal law makes the issue an element of the claim, or when diversity or supplemental jurisdiction attaches to a state law claim. Neither condition is satisfied here.

***First***, the lease is not an element of any claim under the Telecommunications Act. The TCA regulates local governments in their regulatory capacity; it does not require a plaintiff to establish a valid leasehold interest. Accordingly, the lease dispute is not "intertwined" with the merits. *See Clark v. Tarrant Cty., Tex.*, 798 F.2d 736, 741–742 (5th Cir. 1986) (jurisdiction and merits are intertwined where the same statute supplies both the cause of action and the jurisdictional basis).

[105] ROA 4915–4919.

***Second***, the District Court could not rely on supplemental jurisdiction to reach the lease because Article III standing must exist before supplemental jurisdiction may attach. Where the existence of a case or controversy depends on an unresolved state-law issue that is not part of the federal claim, a court may not assume jurisdiction to decide that issue in the first instance. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95 (1998) (rejecting "hypothetical jurisdiction"); *cf. Clark*, 798 F.2d at 742; *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 173–74 (2017) (jurisdictional requirements must be satisfied, not merely asserted).

***Third***, diversity jurisdiction does not supply a basis to adjudicate the lease. Plaintiff has not asserted any state-law claim seeking relief under the Lease, nor invoked 28 U.S.C. § 1332 as a basis to obtain such relief.[106] Diversity jurisdiction permits federal courts to adjudicate state-law claims properly before them; it does not authorize courts to

[106] ROA 20–35.

resolve freestanding state-law issues untethered to any claim. *See* 28 U.S.C. § 1332(a).

The District Court inverted that principle. It assumed jurisdiction to resolve the lease dispute and then relied on that resolution to find standing. Article III does not permit jurisdiction to be manufactured in that manner. Article III does not permit a court to manufacture redressability by resolving a disputed, independent legal issue that is not itself part of the claim before it.

### B. Permitting the District Court's Approach Would Improperly Expand Federal Jurisdiction

The District Court's approach impermissibly expands federal jurisdiction beyond the limits set by Congress and Article III. When Congress makes an ordinarily state-law issue an element of a federal claim, it authorizes federal courts to resolve that issue—but only in the circumstances defined by the statute. For example, the Foreign Sovereign Immunities Act requires federal courts to determine, as a threshold jurisdictional matter, whether property was taken in violation of international law before the expropriation exception to sovereign immunity can apply. *Venezuela*, 581 U.S. at 173–74. Supplemental and

diversity jurisdiction operate similarly. They allow federal courts to adjudicate related state-law claims only when a federal claim independently establishes a case or controversy or the diversity of citizenship requirements are met. 28 U.S.C. §§ 1332, 1367(a).

In any context, federal law defines when jurisdiction may extend to a nonfederal issue. The mere factual or practical importance of a state-law dispute is irrelevant. The issue either forms part of a federal claim or it does not.

Here, the lease dispute does not. Allowing the District Court to decide it anyway simply because it bears on redressability would collapse the distinction between federal and state judicial authority and permit courts to create jurisdiction by resolving issues outside the scope of the claims before them.

### C. Plaintiff Cannot Establish Redressability

"Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107. "To satisfy redressability, a plaintiff must show that 'it is *likely*, as opposed to merely *speculative*, that the injury will be redressed by a favorable

decision.'" *Reule*, 114 F.4th at 368 (internal quotations and citations omitted) (emphasis in original). Where relief depends on the actions of independent actors or the resolution of separate legal disputes, courts should not engage in speculation. *See Lujan*, 504 U.S. at 562; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 43–45 (1976).

This case involves two distinct legal relationships: (1) the Town's exercise of regulatory authority under the TCA, and (2) its separate role as a landowner acting in a proprietary capacity. Plaintiff challenges only the former. It seeks an order requiring the issuance of a permit. It does not assert any claim regarding the Lease or the Town's obligations as landlord.[107] This distinction is dispositive. Construction of the proposed facility requires both regulatory approval and a valid leasehold interest. But the relief sought would affect only the regulatory component. It would not establish Plaintiff's right to access or occupy the property.

Accordingly, even a favorable decision would leave a separate and dispositive barrier unresolved. Because the Lease dispute is not

[107] ROA 20–35.

properly before the Court, any conclusion that the requested relief would enable construction necessarily rests on speculation. Article III does not permit standing to rest on that basis. Where relief addresses only one of multiple necessary legal predicates and leaves another contested and unresolved, redressability is lacking.

### D. Alternatively, if the Lease is Properly Before the Court, it Terminated Under the Unambiguous Terms of the Lease

Even if the Court concludes that it may resolve the lease dispute, the District Court's conclusion that the Lease remains in effect is erroneous.

By its terms, the Lease terminates automatically when a zoning denial becomes "final and unappealable." (ROA 3426) Under Texas law, contractual language is given its plain meaning. See *Uri, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018). The Town Council's denial—which Resolution reflects as the Town's "final action" from which "[n]o further administrative appeals are available—satisfies that condition. (ROA 3978) No administrative appeal exists under local law, and the statutory "appeals" available under Texas law apply only to decisions by zoning boards or administrative officials, not to decisions by a town

council. See TEX. LOC. GOV'T CODE §§ 211.009, 211.011. Nor does the TCA create an appeal. It authorizes a civil "action," not an appellate proceeding. 47 U.S.C. § 332(c)(7)(B)(v). Congress's use of distinct terms—"action," "petition," and "appeal"—confirms that a TCA claim is not an appeal from a local zoning decision. See *King v. Burwell*, 576 U.S. 473, 486 (2015).

Because no appeal is available, the denial is final and unappealable, and the Lease terminated by operation of its own terms. Without a valid leasehold interest, Plaintiff cannot construct the proposed facility. *See also* WESTLAKE, TEX., CODE § 102-94(5)(v) (issuance of specific use permits requires written permission from the owner of the land on which a facility is to be located.) Its alleged injury is therefore not redressable.

## II. DISTRICT COURT SHOULD HAVE GRANTED SUMMARY JUDGMENT FOR DEFENDANTS-APPELLANTS ON COUNTS 1 AND 4 IN THE FSC

All permit denials must be in writing and supported by substantial evidence in the written record. 47 U.S.C. § 332(c)(7)(B)(iii); *see T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 295 (2015). The Resolution, which the Stipulation conclusively established as the final

action and written decision, satisfied the TCA's requirements, but the District Court ignored the Stipulation and Objections without explanation. This Court should reverse and grant summary judgment for Defendants-Appellants on Counts 1 and 4.

### A. The Resolution Satisfies the Written Denial Requirement

Written denials must be accompanied by written reasons for the denial. *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 302 (2015). Written reasons need not be contained in the same instrument as the written denial, and municipalities need not issue formal resolutions that combine the decision and reasons, but courts encourage the practice to aid judicial review. *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 302–03 (2015); *Southfield*, 355 F.3d 601, 606 (6th Cir. 2004).

Consistent with this requirement, the Code requires a written report with reasons for any denial, *see* WESTLAKE, TEX., CODE § 102-94(6), and the Resolution correlates the required findings for SUP approval under the Code with the evidence from the administrative record that supports the denial.[108]

[108] *See* ROA 4667–4687.

### 1. The Parties' Stipulation to the Resolution as the Final Action and Written Decision is Conclusive Evidence as to that Fact

"It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial." *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 206 (5th Cir. 1998) (cleaned up). This is because a "stipulation among the parties to a lawsuit is akin to a contract." *United States v. McKinney*, 758 F.2d 1036, 1047 (5th Cir. 1985).

Here, the Magistrate's Report failed to afford the Stipulation its ordinary legal effect. At the time the parties filed their cross motions for summary judgment, the only genuinely disputed material fact relevant to Counts 1 and 4 was whether the Minutes or the Resolution served as the final action and written decision.[109] But after the parties cross motions for summary judgment and before the Magistrate issued the Report, the parties entered the Joint Pretrial Order that stipulated the

[109] *See* ROA 4912–4913.

Resolution as the final action and written decision.[110] This Stipulation established the Resolution as the final action and written decision.

### 2. Plaintiff's Attempts to Walk Back the Stipulation are Both Procedurally Defective and Substantively Insufficient

Requests to modify a pretrial order or withdraw a stipulation must be made by motion. FED. R. CIV. P. 16(e); *see Martin v. Lee*, 378 Fed. Appx. 393, 395 (5th Cir. 2010). The movant bears a heavy burden to show "clear and convincing demonstration that manifest injustice would otherwise result[]" or the "evidence contrary to the [S]tipulation is substantial." *United States. v. Texas*, 523 F. Supp. 703, 713 (E.D. Tex. 1981); *see Smith v. Blackburn*, 785 F.2d 545, 549 (5th Cir. 1986). Here, Plaintiff-Appellee failed to both follow both the procedural requirements and meet its heavy substantive burden.

Procedurally, Plaintiff-Appellee did not file the required motion to modify or withdraw the Stipulation. Rather, the request appeared in a footnote to Plaintiff-Appellee's Reply to Objections.[111] This failure

---

[110] ROA 4703.

[111] *See* ROA 4960.

deprived both the court below of the occasion to pass on this question and Defendant-Appellant of the full opportunity to respond.

Substantively, Plaintiff-Appellee's substantive arguments also fail to meet the heavy burden required to modify or set aside the Stipulation.

***First***, Plaintiff-Appellee's observation that the Stipulation differed from its prior positions is immaterial.[112] . Just as the Stipulation superseded contrary statements in the Rule 26(f) Report cited in Magistrate's Report, the Stipulation supersedes all other instances cited by Plaintiff-Appellee where it contended that the Minutes served as the final action and written decision.

***Second***, Plaintiff-Appellee's argument that the Stipulation merely reflects the Defendants-Appellants' position fundamentally misapprehends the contract formed by a stipulation.

***Third***, Plaintiff-Appellee failed to show "clear and convincing demonstration that manifest injustice would otherwise result" without modification or withdrawal. *Texas*, 523 F. Supp. at 713; *see Smith v.*

---

[112] ROA 4958-4960.

*Blackburn*, 785 F.2d 545, 549 (5th Cir. 1986). Vertical Bridge seeks to avoid the ordinary legal effect from a joint stipulation that Vertical Bridge's legal counsel drafted and had opportunities to re-review again after approval by Defendants' legal counsel.[113]

### 3. Even Without the Stipulation, the Resolution Properly Qualified as the Final Action and Written Decision

Final action "occurs when the agency 'render[s] its last word on the matter[,]'" *Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 47 (1st Cir. 2009), and determines legal rights and/or consequences. *Bennett*, 520 U.S. 154, 178 (1997). A "final action" to deny a personal wireless service facility: (1) must include a written decision with contemporaneously available written reasons for the decision; but (2) need not take any particular form so long as it provides enough clarity to enable judicial review. *Roswell*, 574 U.S. at 295.

Here, Code § 102-94(6) defines the "last word on the matter" as a written report that includes substantial evidence for the denial. *See Cranston*, 586 F.3d at 47. The Minutes merely memorialized the fact

[113] ROA 4943-4944.

that a hearing and an oral decision occurred. The Minutes themselves bear no resemblance to a written report with substantial evidence as described in the Code, and the routine procedure to adopt minutes from a previous meeting operates a mere intermediate step toward a final action. The self-imposed formalities in Code § 102-94(6) make sense given that virtually no other development projects before the Town Council require written reasons for the denial. Moreover, the Town's choice to issue a written report as its final action promotes efficient judicial review by compiling the decision and reasons into one document. *Roswell*, 574 U.S. at 303.

Notwithstanding the Town's position that the Minutes could not be the final action and written decision, the Report and Recommendation found that the denial lacked substantial evidence in support because it lacked reasons for the denial.[114] But, under the TCA, a denial without written reasons is a *failure to act* within a reasonable time rather than a final action with insufficient reasons. For example, in *Tarpon Towers II, LLC v. City Sylvania*, 625 F. Supp. 3d 667 (N.D.

---

[114] ROA 4922–4924.

Oh. 2022), the court held similarly sparse meeting minutes could not be a written decision as required by the TCA because it lacked any written reasons and therefore could not enable judicial review. *Id.* at 672–73. The Report and Recommendation should have concluded that the Minutes was no action at all.

The Report and Recommendation also erred when it held the Resolution as untimely.[115] Aggrieved parties may seek relief from a failure to act within 30 days after the presumptively reasonable time for a final action expires. 47 U.S.C. §§ 332(c)(7)(B)(ii), (v). Under applicable FCC rules, the presumptively reasonable time expired on September 20, 2024, and the 30-day limitations period expired on October 21, 2024. *See* 47 C.F.R. § 1.6003(c)(iv). However, Plaintiff did not timely raise that claim in either its Complaint or FSC,[116] but the Town raised the statute of limitations defense in its Amended Answer and offered proof in its summary judgment briefings.[117] *See F.T.C. v. Nat'l Bus. Consultants, Inc.*, 376 F.3d 317, 322 (5th Cir. 2004). Thus, the Report

[115] ROA 4925.

[116] ROA 1070–1080.

[117] ROA 1457, 4602–4603.

and Recommendation should have concluded that Plaintiff waived any right to complain that the Town took too long to issue the Resolution.

Finally, the Report and Recommendation erred when it found that the Minutes are the "decision . . . Vertical Bridge challenged."[118] The TCA authorizes challenges only to a "final action"—which the Minutes cannot be without written reasons—or a "failure to act"—which is time barred in this case. *See* 47 U.S.C. §§ 332(c)(7)(B)(v). This legal error turns the final action concept upside down and lets plaintiffs rather than public agencies decide when the "last word on the matter" has been spoken. *See Cranston*, 586 F.3d at 47.

To deem the Minutes as the "final action" would deny the Town's right to choose its procedures and frustrate the judicial legitimate interest in documentation clear enough to enable judicial review. *See Roswell*, 574 U.S. at 303–04. Accordingly, this Court should reverse the District Court and hold that the Resolution is the final action and written decision.

[118] ROA 4925.

### B. Substantial Evidence Supports the Denial

"'Substantial evidence' is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' . . . 'more than a scintilla, but less than a preponderance.'" *Wichita Falls*, 364 F.3d at 256 (internal citations omitted). The reasons for the denial must be authorized by local law  and more than "generalized concerns about aesthetics or property values . . . ." *Id.*; *see also New Cingular Wireless PCS LLC v. City of Jennings*, No. 2:23-CV-01769, 2024 WL 4507832, at *2 (W.D. La. Oct. 16, 2024). "Nevertheless, . . . '[a]esthetic objections coupled with evidence of an adverse impact on property values or safety concerns can constitute substantial evidence.'" *Alltel Corp. v. City of Jackson*, 466 F. Supp. 3d 673, 682 (S.D. Miss. 2020) (quoting *Mun. Commc'ns, LLC v. Cobb Cty.*, 796 F. App'x. 663, 668–69 (11th Cir. 2020)).

Under this "highly deferential" standard, "court[s] may not 're-weigh the evidence or substitute [its] judgment' for the judgment of the local government." *Wichita Falls*, 364 F.3d at 256 (quoting *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001)). Substantial evidence does not demand perfection from local officials; the reasons need only be clear

enough to enable judicial review. *See Roswell*, 574 U.S. at 302. A denial passes muster so long as at least one reason meets the substantial-evidence standard. *See Wichita Falls*, 364 F.3d at 259 (5th Cir. 2004); *New Cingular Wireless, LLC v. City of Brownsville*, No. 1:19-cv-91, 2019 WL 8499340, at *9 (S.D. Tex. Dec. 20, 2019).

Here, both the PZC and Town Council unanimously concluded that the findings required to approve an SUP could not be made for the Proposed Tower.[119] This outcome is both authorized by the Code and supported by substantial evidence in the record. For example:

1. Evidence that the Proposed Tower would violate both the applicable height limit and the required minimum setback from the rear property line precluded findings required under Code § 102-63(e)(2)(a) because a structure more than twice the applicable height limit placed directly on a property line would not "[c]omplement or be compatible with the surrounding uses and community facilities". Similarly, objectively measurable noncompliance with the zone height and setback requirements preclude approval under Code § 102-

[119] ROA 4667–4687.

63(e)(2)(d) because the structure would not “[c]onform in all other respects to all applicable zoning regulations and standards”.

2. The Code expressly requires the Town Council to consider impacts on property values and aesthetics. Code § 102-94(3)(b), (d). Both the PZC and Town Council received public testimony about how the Proposed Tower will dominate the views from and around their nearby homes. The PZC also received testimony from a local realtor about the proportional relationship between a tower’s proximity and visibility and adverse impacts to property values and marketability.[120] Evidence that the Proposed Tower will adversely impact community aesthetics and property values precluded a finding that the specific use will “[c]ontribute to, enhance or promote the welfare of the area of the [specific use] and adjacent properties”.

These adverse impacts could have been avoided but Vertical Bridge failed or refused to consider alternatives that would reduce the overall height. Evidence in the record also showed that the adverse

---

[120] ROA 4134 n.42; PZC Meeting Video at 00:54:00–00:54:30 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Susan Matthews).

impacts to community aesthetics and property values could mitigated through two or more shorter facilities rather than one "monstrosity".[121] Concerns about excessive height and requests for alternatives with multiple, smaller facilities raised by community members, staff and local officials fell on deaf ears.[122] Rather than consider less intrusive alternatives, Vertical Bridge continually increased the overall height—what began as an 80-foot tower, mutated into a more than 130-foot tower as Vertical Bridge stacked additional carriers to boost its rent revenues.[123]

Finally, aesthetic objections rose above mere generalized grievances. At least three residents, which included a realtor specialized in the neighborhood, testified to the adverse visual impact from the Proposed Tower and the concomitant adverse impact on property values.[124] *See City of Jackson*, 466 F. Supp. 3d at 682.

---

[121] ROA 4150 n.60 (citing PZC Meeting Video at 00:12:10–00:12:48 (May 7, 2024), https://westlaketx.new.swagit.com/videos/304510 (statement by PZC Chair Coffey)).

[122] ROA 4260, 4273–4274, 4679–4681.

[123] ROA 4101, 4250, 4254–4255, 4273, 4390.

[124] ROA 4134 n.42 (citing public testimony from Mr. Christiansen, Ms. Eisen and Ms. Matthews); *see also* PZC Meeting Video at 00:42:00–

Commissioner Reeves' concern about interference with view corridors prioritized in the Comprehensive Plan also ties into adverse impacts on property values. A direct relationship exists between the Town's natural landscape and property values:

> Westlake has preserved a high degree of landscape integrity . . . . Rolling hills and pastureland define the character of the Town; and all developments, including commercial expressions, are designed to fit into this context. Contextualization, which grows from a commitment to landscape integrity, is what has helped to preserve the property values sustained in Westlake. It is, therefore, important that the Plan creates mechanisms to continue the commitment to landscape integrity, not only to preserve the pastoral landscape of the Town, but to also preserve property values.

Comprehensive Plan at 74. Thus, Commissioner Reeves' concern that the Proposed Tower undermines the view preservation policies in the Comprehensive Plan is also a concern that the harm to the "landscape

---

00:46:28 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Ted Christiansen); PZC Meeting Video at 00:48:30–00:48:37 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Anna Eisen); PZC Meeting Video at 00:53:10–00:53:50 (July 9, 2024), https://westlaketx.new.swagit.com/videos/309800 (statement by Susan Matthews).

integrity" from a 138-foot tower, with no visual backdrop in a protected view corridor, will erode property values within the Town.

### C. No Other Genuine Disputes of Material Fact Prevent Summary Judgment in Defendants-Appellants' Favor on Count 1

Plaintiff's MSJ raised numerous but non-serious arguments that fail to meet its difficult burden to show no substantial evidence supports any reason for denial. *See Wichita Falls*, 364 F.3d at 259:

***First***, the Resolution is included in the administrative record, incorporated by reference and attachment into the FSC, *see* FED. R. CIV. P. 10(c), and included in the exhibits to Plaintiff's MSJ.[125]

***Second***, complaints that the Resolution does not cite back to the administrative record holds Defendants to the wrong standard. Local government decisions need only be clear enough to enable judicial review. *Roswell*, 574 U.S. at 303.

***Third***, Plaintiff's claim that the record does not support the Town Council's reasons is demonstrably false. Almost all Plaintiff's so-called examples involve instances Plaintiff *did* find in the record. Plaintiff

[125] ROA 3954–3978.

cites exactly one instance where it claims it could not locate references to the Comprehensive Plan, open space and view preservation, but those statements arose from on-the-record statements at the PZC meeting to consider the Application.[126]

***Fourth***, the Town Council properly looked to the Comprehensive Plan for guidance as it applied the Code. The Comprehensive Plan provides foundational policy guidance and context for codified land-use regulations. Indeed, codified land-use rules cannot conflict with a comprehensive plan. *See* TEX. LOC. GOV'T CODE § 211.004. When faced with only bad options, the Comprehensive Plan aids the Town Council assess which option is the least bad (*i.e.*, most closely conforms to its core values and policies).

***Finally***, Plaintiff mischaracterizes all aesthetic criticism and property-values evidence as "generalized grievances".[127] The evidence in the record ties these concerns to the Proposed Tower, its characteristics and adverse impact on aesthetics and property values in the immediate

---

[126] See PZC Meeting Video at 00:17:43–00:18:16 (May 7, 2024) (statement by Commissioner Reeves), https://westlaketx.new.swagit.com/videos/304510.

[127] ROA 4565–4569.

area.[128] Plaintiff-Appellee also over relies on instances where words like "ugly" and "eyesore" were associated with generalized grievances, but colorful adjectives rooted in specific facts can serve as substantial evidence. *See City of Jackson*, 466 F. Supp. 3d at 682.

## III. THE TOWN'S DENIAL DID NOT EFFECTIVELY PROHIBIT WIRELESS SERVICE

Because the District Court granted relief on the substantial-evidence claim, it declined to reach Vertical Bridge's effective prohibition claim under 47 U.S.C. § 332(c)(7)(B)(i)(II).[129] Had the District Court reached the issue, the Town was entitled to judgment as a matter of law.

The TCA does not entitle a provider to its preferred network design; it prohibits only local decisions that prevent the provision of wireless service. That principle is dispositive here. Regardless of which doctrinal formulation applies, Vertical Bridge cannot establish effective prohibition because service can be provided through alternative, less intrusive configurations that it failed to meaningfully pursue.

---

[128] ROA 3956, 3960, 3964, 3968, 3971–3977.

[129] ROA 4919.

### A. No Effective Prohibition Exists Because Feasible Alternatives Were Available

Federal courts have adopted varying formulations of "effective prohibition," but the differences do not aid Vertical Bridge. Under the majority test followed by the First, Second, Third, Ninth, and Tenth Circuits, a plaintiff must show: (1) a significant gap in service; and (2) that the proposed facility is the least intrusive means of remedying that gap.[130] Under the minority test adopted in the Fourth Circuit, Seventh Circuit and applied in the Eighth Circuit, a plaintiff must likewise show a significant gap, but must also establish that no feasible alternatives exist and further efforts would be futile.[131]

---

[130] *See, e.g.*, *Cellco P'ship v. White Deer Twp. Zoning Hearing Bd.*, 74 F.4th 96, 101 (3d Cir. 2023); *AT&T Mobility Servs., LLC v. Vill. of Corrales*, 642 F. App'x 886, 889–90 (10th Cir. 2016); *T-Mobile Cent., LLC v. Charter Tp. of West Bloomfield*, 691 F.3d 794, 808 (6th Cir. 2012); *Helcher v. Dearborn Cty.*, 595 F.3d 710, 728 (7th Cir. 2010); *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 997–98 (9th Cir. 2009); *Cranston*, 586 F.3d at 48; *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999).

[131] *See, e.g.*, *T-Mobile Ne. LLC v. Loudoun Cnty. Bd. of Sup'rs*, 748 F.3d 185, 198 (4th Cir. 2014); *USCOC of Greater Iowa, Inc. v. Zoning Bd. of Adjustment of the City of Des Moines*, 465 F.3d 817, 825 (8th Cir. 2006) (finding no effective prohibition when plaintiff ignored alternatives without "serious consideration"); *VoiceStream Minneapolis, Inc. v. St. Croix Cty.*, 342 F.3d 818, 834–35 (7th Cir. 2003). The First Circuit initially took the minority view but subsequent opinions migrated to the

The FCC has articulated a different standard, under which an effective prohibition occurs when a local government "materially inhibits" a provider's ability to compete in a fair and balanced regulatory environment. *In re: Accelerating Wireless Broadband Deployment*, 33 FCC Rcd. 9088, ¶ 16 (Sept. 27, 2018), *aff'd in part*, *City of Portland v. United States*, 969 F.3d 1020, 1034–35 (9th Cir. 2020), *cert. denied*, *City of Portland v. FCC*, 141 S. Ct. 2855 (2021). Several courts, however, have rejected that formulation as neither controlling nor persuasive.[132]

---

majority view. *Compare Second Generation Props., L.P. v. Town of Pelham*, 313 F.3d 620, 635 (1st Cir. 2002) (adopting the "fruitless" standard), *with Cranston*, 586 F.3d at 50–52 (noting the similarities between the standards and evaluating whether the plaintiff had other alternatives).

[132] *See, e.g.*, *Vogue Tower Partners VII, LLC v. City of Elizabethton*, 752 F. Supp. 3d 912, 919 (E.D. Tenn. 2024) (rejecting the FCC's interpretation as neither binding nor persuasive and citing *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024)); *TowerNorth Dev., LLC v. City of Geneva*, No. 22 C 4151, 2025 WL 975753, at *16 (N.D. Ill. Mar. 31, 2025) (finding no material inhibition when the applicant failed to consider viable alternatives); *New Cingular Wireless PCS, LLC v. Kootenai Cty.*, No. 2:23-CV-00124-AKB, 2025 WL 563911, at *10 (D. Idaho Feb. 20, 2025) (implying that failure to meet the judicial test means no material inhibition); *Horizon Tower Ltd., LLC v. Park Cty.*, No. 2:23-CV-37-ABJ, 2024 WL 4525229, at *7–*11 (D. Wyo. Oct. 4, 2024) (applying both tests and concluding that an effective

Across these formulations, a common principle controls: no effective prohibition exists where service can be provided through feasible alternative means. A "feasible alternative" does not require a fully engineered, permit-ready solution. It requires only a showing that service could be provided through a different, less intrusive configuration, even if doing so would require additional infrastructure, coordination, or departures from the provider's preferred design. Vertical Bridge's claim fails under any of these standards because the record establishes that alternative configurations could address any asserted service deficiency.

Vertical Bridge's claim fails under any of these standards. Even assuming *arguendo* that a significant gap exists, the record establishes that the "Two-Site Solution" is a potentially available and technically feasible alternative to the proposed Tower. Vertical Bridge neither adopted that alternative nor meaningfully investigated other less intrusive options. Its claim therefore fails under both the majority and

---

prohibition under the judicial test is tantamount to a material inhibition).

minority tests, which independently require a plaintiff to pursue feasible alternatives before asserting an effective prohibition.

### B. Feasible, Less Intrusive Alternatives Defeats the Claim

The undisputed evidence shows that Vertical Bridge declined to meaningfully pursue less intrusive alternatives capable of addressing the alleged service gap.

The Town identified a multi-site alternative using shorter structures that could provide service improvements in the relevant area.[133] That configuration, referred to as the "Two-Site Solution," is: (1) technically feasible, because it "would achieve the same or better coverage compared to Vertical Bridge's proposed tower;[134] and (2) potentially available, because it relies on accessible or Town-controlled locations.[135] The mere facts that this design differs from Vertical Bridge's preferred single-tower solution or requires additional facilities does not render it technically infeasible or unavailable.

---

[133] ROA 1887–1888, 1900–1906.

[134] ROA 1905.

[135] ROA 1897, 1906, 1933-1934.

Vertical Bridge's own expert confirmed that alternative configurations could address the asserted deficiencies.[136] He acknowledged that network performance issues of the type alleged here are routinely resolved by adding additional sites and then optimizing surrounding facilities.[137] Indeed, he testified that the "primary way to remedy" interference and service issues is "to provide a dominant server," which may be accomplished by adding sites and adjusting surrounding infrastructure.[138] He further explained that wireless networks are iteratively designed and refined through the addition of sites, tuning of antennas, and other adjustments.[139]

That testimony is fatal to Vertical Bridge's claim. It confirms that no single configuration is required to provide service, and that alternative, less intrusive network designs are both workable and commonplace in practice. To be sure, the Two-Site Solution (or other alternatives) may differ from Vertical Bridge's preferred design in cost,

[136] ROA 2881.

[137] ROA 2880–2881.

[138] ROA 2871.

[139] ROA 2871.

efficiency, or deployment approach. But that is legally irrelevant. The TCA asks whether service can be provided, not whether it can be provided in the provider's preferred manner. A locality does not "effectively prohibit" service by requiring infrastructure to be deployed in a less intrusive configuration where service remains achievable.

Courts do not require local governments to present turnkey alternatives; they must only identify feasible options demonstrating that service can be provided without the proposed facility. *Nat'l Tower Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 24 (1st Cir. 2002). The Town satisfied that burden.

#### 1. The Existence of a Feasible Alternative Defeats the Claim Under Any Test

Under the majority "least intrusive means" framework, a provider must demonstrate that its proposal is the least intrusive feasible option. That inquiry incorporates a burden-shifting framework. See *Am. Tower Corp. v. City of San Diego*, 763 F.3d 1035, 1057 (9th Cir. 2014). While an applicant may make a prima facie showing through good-faith investigation of alternatives, a locality may rebut that showing by

identifying "potentially available and technically feasible" alternatives. *Id.* (citing *Anacortes*, 572 F.3d at 996–99).

Under the minority approach, the burden is even higher: a provider must affirmatively show that no feasible alternatives exist, and that burden cannot be satisfied merely by demonstrating that alternatives are more costly or less efficient. *T-Mobile Northeast LLC v. Fairfax County Bd. of Sup'rs*, 759 F. Supp. 2d 756, 769 (E.D. Va. 2010); *Town of Amherst v. Omnipoint Commc'ns Enters., Inc.*, 173 F.3d 9, 14 (1st Cir. 1999).

Similarly, under the FCC's "material inhibition" standard, the availability of alternative means of providing service precludes a finding that local regulation materially inhibits deployment.

Under any of these formulations, the existence of alternative configurations capable of addressing the asserted service gap—whether through multiple sites, different heights, or different placements—defeats an effective-prohibition claim unless the provider demonstrates that those alternatives are not viable. Vertical Bridge made no such showing.

### 2. Vertical Bridge Failed to Meaningfully Investigate or Rebut Available Alternatives

Even under the most plaintiff-friendly formulation of the majority test, Vertical Bridge was required to make a good-faith effort to identify and evaluate less intrusive alternatives before seeking federal relief.

As the First Circuit has explained, the TCA "gives local authorities an opportunity to consider any feasible alternatives before courts launch 'the heavy artillery of federal preemption.'" *Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 52 (1st Cir. 2009) (quoting *Pelham*, 313 F.3d at 635). Accordingly, a provider must "develop a record demonstrating that it has made a full effort to evaluate the other available alternatives and that the alternatives are not feasible." *SW Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 63 (1st Cir. 2001). That burden cannot be satisfied merely by showing that alternatives "do not provide the same quality of wireless service or are more costly." *Fairfax Cty. Bd. of Sup'rs*, 759 F. Supp. 2d at 769 (citing *360 degrees Comm'cns Co. of Charlottesville v. Bd. of Sup'rs of Albemarle Cty.*, 211 F.3d 79, 87 (4th Cir. 2000)).

This allocation of responsibility is critical. As the First Circuit has observed:

> We doubt that Congress intended local zoning boards to pay for experts to prove that there are alternative sites for a proposed tower, simply to defend themselves from an easily made accusation in court that an individual denial of a permit amounts to an effective prohibition.

*Plainville*, 297 F.3d at 24.

And where a provider fails to "adduce evidence allowing for a [locality's] meaningful comparison of alternative designs or sites," it necessarily fails to demonstrate that its proposal is the least intrusive means—and the locality is entitled to judgment as a matter of law on an effective prohibition claim. *San Diego*, 763 F.3d at 1057; *City of Anacortes*, 572 F.3d at 995.

Vertical Bridge did not meet its burden.

The Town repeatedly requested evaluation of multi-site and reduced-height alternatives.[140] Vertical Bridge refused or failed to meaningfully investigate those options.[141] As a result, it failed to

---

[140] ROA 3883, 4409.

[141] ROA 3382-3383.

provide the Town with evidence permitting any "meaningful comparison of alternative designs or sites," which is independently fatal under *Anacortes*. 572 F.3d at 995. The Town Council expressly relied on that failure in denying the application.[142]

Rather than reject the Two-Site Solution as technically infeasible, Vertical Bridge objected because it departed from its preferred network design:

> [C]hanging a network design . . . doing something outside of what their standard approach is to design is not reasonable.[143]

That is not a legally cognizable justification. The TCA does not require local governments to accommodate a provider's preferred design; it prohibits only decisions that prevent the provision of service altogether. Because Vertical Bridge failed to meaningfully investigate or rebut a feasible, less intrusive alternative, it cannot establish effective prohibition under any governing standard.

---

[142] ROA 3962-3964.

[143] ROA 2890.

### C. No Effective Prohibition under Section 253(a)

The same result follows under 47 U.S.C. § 253(a). The Fifth Circuit has recognized that infrastructure providers may, in appropriate circumstances, invoke Section 253(a). *Pasadena*, 76 F.4th at 436. But Section 253(a) prohibits only regulations that "materially inhibit" the provision of telecommunications services, not ordinary land-use decisions that channel deployment into less intrusive configurations.

Here, the Town did not prohibit deployment. It rejected a single, highly intrusive design where alternative configurations could provide service. As demonstrated above, service can be provided through different configurations involving additional sites, different placements, or reduced heights. The Town's decision therefore regulates the manner of deployment, not its existence.

A locality does not "materially inhibit" service by requiring infrastructure to be deployed in a less intrusive configuration where service remains achievable. That is precisely what occurred here. Accordingly, Vertical Bridge cannot establish effective prohibition

under either Section 332(c)(7) or Section 253(a), and the Town was entitled to judgment as a matter of law.

## IV. THE DISTRICT COURT ABUSED ITS DISCRETION IN GRANTING THE PERMANENT INJUNCTION

This Court reviews the grant of a permanent injunction for abuse of discretion. *Thomas v. Hughes*, 27 F.4th 995, 1011 (5th Cir. 2022) (citing *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 594 (5th Cir. 2003)). "An abuse of discretion occurs where the trial court '(1) relies on clearly erroneous factual findings . . . [,] (2) relies on erroneous conclusions of law . . . , or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief.' " *Id.* (alterations and omissions in original) (quoting *Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 62 F.3d 690, 693 (5th Cir. 1995)).

Even assuming a violation of the TCA's writing requirement, the District Court abused its discretion by granting the extraordinary remedy of a mandatory injunction requiring permit issuance rather than remanding to the Town to cure the procedural defect.[144]

> [A] party seeking a permanent injunction must establish (1) actual success on the merits; (2) that

---

[144] ROA 4927–4928.

> it is likely to suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in that party's favor; and (4) that an injunction is in the public interest.

*Pasadena*, 76 F.4th at 441. None of these factors justified the relief ordered here.

Critically, the District Court ordered mandatory injunctive relief without finding that the Town's decision lacked substantial evidence, constituted an effective prohibition, or was the product of hostility.[145] Instead, the court's ruling turned solely on an alleged deficiency in the Town's written decision. Transforming a procedural defect into a substantive entitlement to a permit constitutes plain error and an abuse of discretion.

### A. A Procedural Writing Violation Does not Warrant Mandatory Injunctive Relief

The TCA does not prescribe a specific remedy for violations of Section 332(c)(7)(B). *See* 47 U.S.C. § 332(c)(7)(B)(v). Courts consistently recognize that injunctive relief under the TCA compelling permit issuance is appropriate only where the record establishes that denial

[145] ROA 4910–4929.

violated the TCA on substantive grounds – such as lack of substantial evidence, effective prohibition, or reliance on impermissible RF considerations. *See, e.g.*, *Plainville*, 297 F.3d at 24–25; *SPRINTCOM, Inc. v. P.R. Regul. & Permits Admin.*, 553 F. Supp. 2d 87, 96 (D.P.R. 2008); *ExteNet Sys., Inc. v. Vill. of Plandome*, No. CV 19-7054, 2021 WL 4449453, at *22 (E.D.N.Y. Sept. 29, 2021).

By contrast, where the alleged violation concerns only the adequacy or lack of the written denial, courts routinely remand to the locality to cure that defect. See *T-Mobile S., LLC v. City of Milton, Ga.*, 728 F.3d 1274, 1281 (11th Cir. 2013); *Am. Towers LLC v. Town of Shrewsbury*, No. 17-10642-FDS, 2018 WL 3104105, at *13 (D. Mass. June 22, 2018); *AT&T Wireless Servs. of Fla., Inc. v. Orange Cty.*, 982 F. Supp. 856, 860–62 (M.D. Fla. 1997).

As one court explained, even where a locality fails to sufficiently articulate its reasoning, an injunction requiring permit issuance is not automatic because local authorities must be given "an opportunity to remedy any defect and render a decision." *Shrewsbury*, 2018 WL 3104105 at *13. This reflects the well-established principle that local

governments "are in the best position to make decisions about individual variance application[s]." *Id.*

That principle applies with particular force where, as here, the alleged violation is merely a failure to adequately describe the reasons for denial and not a lack of substantive justification.

### B. The District Court Ordered the Wrong Remedy for the Alleged Violation

This case does not involve any of the circumstances in which courts have deemed mandatory injunctive relief appropriate. It is not a case where: (i) the application indisputably complied with all zoning requirements; (ii) the denial lacked substantial evidence; (iii) the denial effected a prohibition on personal wireless services; (iv) the denial was based on hostility to wireless facilities and compliance with the TCA; or (v) the locality relied on impermissible RF emissions concerns. See *Brehmer v. Planning Bd. of Town of Wellfleet*, 238 F.3d 117, 121 (1st Cir. 2011); *SPRINTCOM*, 553 F. Supp. 2d at 96; *Plainville*, 297 F.3d at 24–25.

Instead, the District Court's ruling rested solely on the conclusion that the Town's contemporaneous written decision, its meeting minutes,

failed to adequately set forth the reasons for denial.[146] The court did not hold that the denial lacked substantial evidence, that it was motivated by hostility, or that it amounted to an effective prohibition.[147]

That distinction is dispositive. The appropriate remedy for a deficient written decision is **a proper written decision, not a compelled permit**. Indeed, the Town subsequently issued the Resolution, which sets forth detailed findings supported by substantial evidence, including Vertical Bridge's failure to investigate and present less intrusive alternatives.[148] The Town Council's decision reflects a considered exercise of its zoning authority, not hostility or obstruction. Accordingly, even accepting the District Court's premise that the initial written decision was deficient, the proper course was to remand to the Town to cure that deficiency, not to award the most extreme form of equitable relief.

[146] ROA 4920–4927.

[147] ROA 4910–4929.

[148] ROA 3955–3978.

### C. The District Court Independently Abused Its Discretion Under Each Prong of the Standard

The District Court's decision constitutes an abuse of discretion on multiple independent grounds:

***First***, it relied on a clearly erroneous factual premise – that the Town's meeting minutes constituted the operative written denial – despite the parties' stipulation that the Resolution provided the Town's written reasons.[149]

***Second***, it committed legal error by treating a procedural writing deficiency as warranting the substantive remedy of permit issuance. Courts consistently reject mandatory injunctions in such circumstances and instead remand to allow the locality to articulate its reasoning. See *Shrewsbury*, 2018 WL 3104105 at 13; *City of Milton*, 728 F.3d at 1281; *Orange Cty.*, 982 F. Supp. at 862.

***Finally***, even under its own findings, the District Court misapplied the law by awarding mandatory injunctive relief without any finding that the denial lacked substantial evidence or constituted

[149] ROA 4922–4925.

an effective prohibition.[150] The court thus ordered an injunction to prevent the Town from "papering over" a violation consisting only of inadequate "paper," while never finding a substantive defect.[151]

That is not the "full relief" contemplated by the TCA. See *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*, 20 F. Supp. 2d 875, 881 (E.D. Pa. 1998) (citing *Illinois RSA No. 3, Inc. v. Cty. of Peoria*, 963 F. Supp. 732, 747 (C.D. Ill. 1997)). Where the violation is a deficient written explanation, full relief is the issuance of a compliant written decision.

### D. Traditional Equitable Factors Do Not Support Injunctive Relief

The traditional equitable factors likewise do not support the extraordinary relief granted here. Vertical Bridge has not shown irreparable harm where it remains able to obtain relief upon issuance of a proper written decision. Nor do the equities favor overriding local zoning authority based on a procedural defect. And the public interest, which under the TCA balances federal objectives with preservation of

---

[150] ROA 4927–2928.

[151] ROA 4928.

local land-use control, does not support a mandatory injunction absent a clear substantive violation.

Courts have consistently cautioned that local zoning authorities are often "lay member boards without many resources" and should not lose their regulatory authority based solely on deficiencies in drafting written decisions. *Plainville*, 297 F.3d at 24; *Orange Cty.*, 982 F. Supp. at 862.

**E. The Proper Remedy is Remand**

Where, as here, the alleged violation concerns the adequacy of the written denial rather than the substance of the decision, the appropriate remedy is remand. *See, e.g.*, *City of Milton*, 728 F.3d at 1281 (remanding for locality to "adequately state in writing the basis for its denial"). Accordingly, this Court should vacate the permanent injunction and remand with instructions to return the matter to the Town Council to cure any procedural deficiency consistent with the TCA's allocation of authority to local land-use bodies.

Alternatively, because the Town has already issued Resolution with reasons supported by substantial evidence, this Court should either consider that Resolution as the written denial in reviewing the

summary judgment Order *de novo*, or remand with instructions for the District Court to do so. *See Orange Cty.*, 982 F. Supp. at 862 (ordering a return to mandate and noting that failure to support a denial without substantial evidence could be grounds for injunctive relief).

## CONCLUSION

The Town respectfully requests that this Court reverse the Order and Final Judgment based on these legal errors and clearly erroneous factual findings, and remand with instructions to grant summary judgment for the Town.

Respectfully submitted,

ROBERT C. MAY III
ADAM N. MENTZER
COLANTUONO, HIGHSMITH & WHATLEY, PC
790 E. Colorado Blvd., Ste. 850
Pasadena, CA 91101
213-542-5700 (office)
213-542-5710 (facsimile)
rmay@chwlaw.us
Counsel for Defendant-Appellants

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on June 1, 2026, on all registered counsel of record, and has been transmitted to the Clerk of the Court:

| | |
|---|---|
| William Bebb Francis , III<br>The Francis Law Firm, P.C.<br>112 E. Pecan St., Suite 550<br>San Antonio, TX 78205<br>210/222-1100<br>Fax: 210/222-2468<br>Email:<br>wbfrancis@francislawfirm.com | *Attorney for Plaintiff Vertical Bridge Development, LLC*<br><br>***Via CM/ECF*** |
| Zoe Brannon<br>Kyle Hirsch<br>Ben Ford<br>Daniel Nester<br>Bryan Cave Leighton Paisner LLP<br>211 North Broadway<br>Suite 3600<br>St. Louis, MO 63102<br>314-259-2000<br>Fax: 314-259-2020<br>Email: zoe.brannon@bclplaw.com | *Attorney for Plaintiff Vertical Bridge Development, LLC*<br><br>***Via CM/ECF*** |

| | |
|---|---|
| Kolten Charles Ellis<br>Direct: 321-266-2161<br>Email: kolten.ellis@bclplaw.com<br>Fax: 314-552-8275<br>[COR LD NTC Retained]<br>Bryan Cave Leighton Paisner, L.L.P.<br>Suite 3600<br>211 N. Broadway<br>1 Metropolitan Square<br>Saint Louis, MO 63102-2750 | *Attorney for Plaintiff Vertical Bridge Development, LLC*<br><br>***Via CM/ECF*** |
| Jean-Claude Andre<br>Bryan Cave Leighton Paisner LLP<br>120 Broadway, Suite 300<br>Santa Monica, CA 90401<br>(310) 576-2148<br>Email: jcandre@bclplaw.com<br>raul.morales@bclplaw.com<br>jean-claude-andre-0762@ecf.pacerpro.com | *Attorney for Plaintiff Vertical Bridge Development, LLC*<br><br>***Via CM/ECF*** |

****Courtesy Copies via Email Only:***

| | |
|---|---|
| Kyle Hirsch<br>Ben Ford<br>Daniel Nester<br>Bryan Cave Leighton Paisner LLP<br>211 North Broadway<br>Suite 3600<br>St. Louis, MO 63102<br>314-259-2000<br>Fax: 314-259-2020<br>Email: kyle.hirsch@bclplaw.com*<br>ben.ford@bclplaw.com*<br>dan.nester@bclplaw.com* | *Attorney for Plaintiff Vertical Bridge Development, LLC* |
| Justin David Hanna | *Attorney for Plaintiff Vertical Bridge Development, LLC* |

Bryan Cave Leighton Paisner LLP
2200 Ross Avenue
Suite 4200w
Dallas, TX 75201-7965
214-721-8000
Email: justin.hanna@bclplaw.com*

L. Stanton Lowry
Matthew C G Boyle
Alex Crowley
Boyle & Lowry
4201 Wingren Drive
Suite 108
Irving, TX 75062
214-549-7839
Email: slowry@boyle-lowry.com*
mboyle@boyle-lowry.com*
acrowley@boyle-lowry.com*

*Attorneys for Defendants the Town of Westlake, Texas and the Town Council for the Town of Westlake, Texas*

Matthew Butler
Law Office of Matt Butler PLLC
2860 S. State Hwy 161
No. 336
Grand Prairie, TX 75052
214-301-5828
Email: matt@mattbutlerlaw.com*

*Attorneys for Defendants the Town of Westlake, Texas and the Town Council for the Town of Westlake, Texas*

**ROBERT C. MAY III**
Counsel for Defendants-Appellants

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

this brief contains 12,978 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2. This brief also complies with the typeface requirements of FED. R. APP. P. 32(a)(6) because:

this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 with a 14 point font named Century Schoolbook.

**ROBERT C. MAY III**
Counsel for Defendants-Appellants

Dated: June 1,2026